IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KERRY L. STEVENSON,

    Plaintiff,

v.

KARL M. HOFFMAN,

    Defendant.

OPINION and ORDER

Case No. 17-cv-490-wmc

While incarcerated at the New Lisbon Correctional Institution ("NLCI") in March of 2015, *pro se* plaintiff Kerry Stevenson claims that the defendant, Dr. Karl Hoffman, was deliberately indifferent to his report of a lump on his head in violation of the Eight Amendment. Tragically, that lump ultimately required a craniectomy to rectify a bone infection, scalp abscess and epidural abscess. Now before the court is defendant's motion for summary judgment. (Dkt. #14.) Because no reasonable jury could find that the defendant acted with deliberate indifference on the evidence of record, the court will grant Dr. Hoffman's motion and enter judgment in his favor.

UNDISPUTED FACTS[1]

In March of 2015, Dr. Hoffman was employed by the Wisconsin Department of Corrections ("DOC"), and he was working as a physician at NLCI.

---

[1] The following facts are material and undisputed, unless otherwise noted. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, as necessary.

**I.    Stevenson's Head Condition and Dr. Hoffman's Referral to a Neurologist**

In 2012, prior to the relevant time period, Stevenson underwent a right-side craniotomy after a serious motorcycle crash. In 2014, he began experiencing seizures and was diagnosed with trauma induced epilepsy. He was also diagnosed with a subdural hematoma. Stevenson is also diabetic. The combination of these conditions has rendered Stevenson more susceptible to infection.

On March 9, 2015, when Stevenson was incarcerated at NLCI, he suffered a seizure. In response, he was transported to the Mile Bluff Medical Center Emergency Room. The physical exam at the time was negative for evidence of head injury, and Stevenson's mental status was normal. Although discharged back to NLCI that same day, Stevenson was instructed to return to the emergency room if his condition worsened. Dr. Hoffman examined Stevenson for the first time on March 19, 2015, as a follow-up to his hospitalization, but Stevenson is not pursuing a claim related to that examination. Dr. Hoffman cannot remember whether he knew, at that time, that Stevenson previously underwent head surgery, but he was aware that Stevenson went to the emergency room after suffering a seizure. Dr. Hoffman does not believe that he examined Stevenson's skull during this exam, but during his deposition, Hoffman testified that he had a sense that he "wasn't all there" because of complications with the brain injury he suffered as a result of the motorcycle accident.

At around the same time as that exam, Stevenson noticed a mass on the right side of his skull and reported it to Nurse Carol Walter. On April 9, 2015, Stevenson was examined by a nurse, who memorialized their discussion, in part, as follows:

> States lump on side of [right] head a few weeks since his seizure. States sometimes it gets bigger during the day and harder … States not sure if he had a lump on [right] side of head [before] seizure or not. States noticed lump about 3 weeks ago.

(Ex. 1000 (dkt. #17-1) at 71-72.) The nurse described the lump as 3.5 cm in diameter, fluid-filled and soft, but that Stevenson denied any pain. However, Stevenson avers that the lump was actually painful if pressure was applied to it. The nurse also reported normal vital signs, including normal temperatures.

After speaking with Dr. Hoffman, the nurse scheduled an appointment for Stevenson to meet with Dr. Hoffman. While Dr. Hoffman does not remember the conversation with the nurse, he avers that his practice would have been to defer to the nurse's assessment when evaluating next steps for Stevenson. Dr. Hoffman testified in his deposition that he, like doctors working outside of prisons, routinely rely on skilled nurses to assess and triage patients. Hoffman also admitted being overwhelmed by the number of patients he had to see during this time period, further admitting that he "did not go through every chart every day and look at every nursing documentation," but that when he saw a problem, he would "go back a couple pages" to see what the documentation had been. (Hoffman Dep. (dkt. #19) at 29, 38-39.)

On April 15, 2019, Stevenson was again seen by Nurse Walter. During that examination, Walter once again assessed the lump on his head, recording that it was 3.0 cm in diameter, soft, but had not changed since he was seen on April 9. In contrast, Stevenson avers that he believed the lump had grown to the size of a golf ball (about 4.3 cm) by that time. (Stevenson Decl. (dkt. #22) ¶ 15.) The nurse reported that his vitals were normal, and he was not in pain, but again Stevenson claims that the lump was painful

3

to the touch. (*Id.* ¶ 24.) During this visit, they discussed Stevenson's recent dizzy spell and sunburn. According to Stevenson, he also discussed the lump on his head with Walter. Afterwards, the nurse did not consult with Dr. Hoffman or any other doctor, noting that Stevenson was scheduled to be seen by a physician that week.

Dr. Hoffman examined Stevenson two days later, on April 17, 2016. During that appointment, Stevenson reminded Hoffman that the lump had been there for over a month. Dr. Hoffman assessed Stevenson's head, and noted:

> [Right] temple has a soft-fluid feeling bulge, [approximately] 2-3-cm diameter, not red, not tender, seems associated with the craniotomy scar.

(Ex. 1000 (dkt. #17) at 67-68.) Dr. Hoffman did not believe Stevenson was suffering from an infection because the lump was not red, warm to the touch, and Stevenson did not report pain. Instead, Dr. Hoffman was concerned that he was suffering from a build-up of fluid inside and outside of his brain (hydrocephalus), which was causing pressure. (*See* Ex. 1000 (dkt. #17-1) at 68.) Dr. Hoffman later testified in his deposition about his impressions,

> Impressions: No. 1, he had seizures. No. 2, he had a bulge in the right temple possibly related to his old head trauma. And again, I was not looking for infection. I was looking for an increased intracranial pressure and a breach in the skull allowing that fluid to come through and bulge the scalp, ok? That what I thought I was looking for. It did not look like an infection.

(Hoffman Dep. (dkt. #19) at 51-52.) Yet Dr. Hoffman also testified that the "goose egg" from his seizure should have been resolved. (Hoffman Dep. (dkt. #19) at 46-47.)

Stevenson disputes Dr. Hoffman's assessment insofar as he avers that the bulge was the size of a golf ball, which would have been about one centimeter larger in diameter, and

4

he claims that the lump was painful when pressure was applied to it; Stevenson agrees that Dr. Hoffman did not discuss the possibility of an infection.

In any event, Dr. Hoffman decided to order a neurology consult and a head CT scan, which took place ten days later, on April 27, 2019, at Mile Bluff Medical Center. On April 27, Stevenson's CT scan came back abnormal, with the following note from a Mile Bluff Medical Center employee: "MRI could be considered for further evaluation. Neurosurgical consultation is recommended." (Ex. 1000 (dkt. #17-1) at 13.) The off-site service form, also filled out that day and requested the same, suggested more urgency: "Needs to be evaluated by neurosurgeon ASAP." (Kinne Decl., Ex. 1 (dkt. #23-1).) Hoffman testified that he did not make these notes and does not know who wrote them.

Regardless of who made the referral, Stevenson was admitted to the Neurosurgery Department at the University of Wisconsin ("UW") Hospital that same day, and he stayed at UW for two days for monitoring and testing. The UW Hospital discharged Stevenson on April 29, with the following note, written by UW Nurse Practitioner Andrea Strayer:

> [Stevenson] began to notice a right temporal fluid collection that is present in the morning but swells throughout the day and becomes more firm at night. This has been present for approximately the last 4 to 5 weeks. As workup for the fluid collection, a scheduled head CT was obtained yesterday, with concern for extracranial fluid collection as well as hypodensity within the right temporal lobe which could not definitely be related to his encephalomalacia status post contusion. For this reason he was admitted to the UW for further management. He currently has no complaints. He has no headaches, numbness, tingling or weakness. He [has] no vision changes, no speech difficulties. He has had no fevers, chills, nausea, vomiting, weight loss, weight gain, or night sweats.
>
> …

> Mr. Stevenson was admitted to the neurosurgery services for serial neurologic examinations and evaluation for possible brain abscess. Infection markers were normal.
>
> …
>
> He is neurologically stable and should return with follow-up head CT to [evaluate] for progression or evolution in right temporal area.

(Ex. 1000 (dkt. #17-1) at 63.)

During Stevenson's April 27-29 stay at UW, no operative procedures were performed, and the abscess was not drained or tested. Rather, his discharge summary recommended follow-up in "2 weeks with head CT with contrast." (*Id.* at 62.) Stevenson was not diagnosed with an infection at any time during this stay at UW, but the plan was to have a neurosurgeon assess him. The day after he returned from UW, Dr. Hoffman also saw Stevenson and scheduled him for follow-up care, including a CT and neurosurgery visit in two weeks.

Two weeks and one day later, on May 12, 2015, Stevenson underwent the follow-up CT scan. He met with Neurosurgery Nurse Practitioner ("NP"), Letitia Geanon, that same day. NP Geanon reviewed his history, noting that the testing and follow-up was ordered for possible infection, even though the markers still indicated that the risk of an infection were within normal limits. Eventually, the NP diagnosed Stevenson with an infected-bone-flap osteomyelitis and a small front scalp abscess, noting: "This needs to be surgically removed. We will schedule [Stevenson] for a craniectomy sometime next week and let the prison know." (Ex. 1000 (dkt. #17-1) at 36.) That same day, another UW NP, T. Brooke Schultz, authored a treatment note, repeating the diagnoses and noting that Stevenson would be undergoing surgery the following week at UW Hospital. The abscess

6

was not drained or tested at the UW that day, and no procedures were performed. Instead, Stevenson was discharged back to NLCI and scheduled to return for surgery.

Osteomyelitis is a bacterial infection in the bone, typically caused by bacteria that live on the skin, but it may occur as a result of the introduction of bacteria into the body in other ways. It is an indolent, slow-growing infection that is often present for years before it is diagnosed. Once diagnosed, it is impossible to determine how long a patient has had it. Typical symptoms of osteomyelitis include pain and swelling. While a fever may present at the onset of the infection, the fever may resolve while the infection remains. Often, the only symptom of this type of infection is pain over the infected bone. Since symptoms of osteomyelitis are often difficult to distinguish from other conditions, this type of infection is difficult to diagnose. More broadly, when a mass is infected, it tends to increase in size. However, a cyst or benign lipoma may also be a cause of an enlarging scalp mass, but a lipoma might feel different. While scalp abscesses are rare and do not often lead to osteomyelitis, diabetics are more susceptible to scalp abscesses and infections.

Stevenson underwent the craniectomy on May 21, 2015. However, during the surgery, Stevenson was also diagnosed with an epidural abscess. The surgery was uncomplicated, as was his six-week anti-infective course following surgery.

An epidural abscess is typically accompanied by fever, headache, fatigue and sometimes nausea and vomiting. This type of abscess is diagnosed using imaging studies including a CT scan or MRI. Alternatively, the abscess may be surgically drained and the

fluid tested to determine the cause of the infection.  It is impossible to determine what happened first -- the abscess or the osteomyelitis.

Between the time that Dr. Hoffman learned about the mass in Stevenson's head in April of 2015, and when he received treatment on May 21, 2015, Stevenson claims he suffered intense pain and discomfort, and he lived in fear for his health and life.

II.     Dr. Gerald Frank's Expert Opinions

With the help of his counsel, Stevenson retained an expert, Dr. Gerald Frank, who specializes in internal medicine.  Dr. Frank is critical of Dr. Hoffman's handling of Stevenson's abscess in two respects.  First, Dr. Frank criticizes Dr. Hoffman's April 17 examination: "The mass should have been further evaluated by aspirating the fluid inside to find out if it was blood, clear fluid, infected fluid so that appropriate treatment could commence." (Frank Dep. (dkt. #18) at 47.)  Second, he opines that Dr. Hoffman should have immediately referred Stevenson to a neurosurgeon rather than a neurologist.  (*Id.* at 47-48, 57.)  In Dr. Frank's opinion, Stevenson should have been seen "within a few days" of the April 17 appointment, and that he should have been admitted for surgery sooner than May 21.  However, Dr. Frank agreed in his deposition that the neurologist could also have made the referral of Stevenson to a surgeon.  Regardless, according to Dr. Frank, since untreated osteomyelitis can lead to global brain infection and permanent brain injury or

death, Dr. Hoffman's delay in seeking appropriate treatment constituted deliberate indifference.

OPINION

Defendant seeks judgment in his favor on plaintiff's Eighth Amendment deliberate indifference claim. A prison official may be held liable under the Eighth Amendment if he or she was "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). Here, the parties do not dispute that plaintiff suffered from a serious medical condition requiring surgery, so the question is whether Dr. Hoffman acted with deliberate indifference to that need.

"Deliberate indifference" means the officials are aware that the prisoner needs medical treatment for a serious condition, but chooses to disregard that need by consciously failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, but may require something less than *purposeful* acts. *Farmer*, 511 U.S. at 836. The point of division between the two standards lies where (1) "the official knows of and disregards an excessive risk to inmate health or safety," or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable

9

steps to avoid it. *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

The Court of Appeals for the Seventh Circuit recently reaffirmed that "[a] prison medical professional faces liability only if his course of treatment is 'such a substantial departure from accepted professional judgment, practice, or standards[] as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Campbell v. Kallas*, -- F.3d --, 2019, 3886912, at *7 (7th Cir. Aug. 19, 2019) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). In *Petties,* the Seventh Circuit acknowledged the difficulty of applying this standard in the medical context, outlining examples of conduct that could support a finding of deliberate indifference: when a doctor refuses to take instruction from a specialist; when a doctor fails to follow an existing protocol; when a medical provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or where the treatment involved inexplicable delay lacking a penological interest. *Petties*, 836 F.3d at 729-31. As to each defendant, the court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* at 728.

10

Plaintiff's criticisms of Dr. Hoffman's treatment here might point to some imperfections in his approach, but do not support a finding that he simply abandoned professional judgment. Here, construing the evidence of record in the light most favorable to plaintiff, the most a reasonable jury could conclude is that Dr. Hoffman acted with some degree of negligence in not assessing plaintiff sooner for follow up by a neurologist for a possible infection on April 17. The record of plaintiff's symptoms (including his averment that it hurt when pressure was applied), the slow progress and almost symptom-free nature of the infection, and the rarity of the abscess, suggest that Dr. Hoffman may have had the wrong suspicion as to the actual cause of the lump, but the mistake was reasonable given plaintiff's previous surgery. Moreover, the record of how treatment specialists in UW Hospital's neurology department *subsequently* decided to treat plaintiff's condition seems to confirm that Dr Hoffman's lack of urgency was at least within the realm of negligence, not deliberate indifference.

Indeed, plaintiff also points out that Dr. Hoffman admitted to being overworked and relying on the recommendations of the nurses he was working with in making assessments. However, no evidence of record suggests that Dr. Hoffman's reliance on Walter's recommendation in April was misplaced. To the contrary, Dr. Hoffman was made aware of plaintiff's history, learned about his recent seizure and lump, and informed Walter that he should be scheduled to be seen. There is no suggestion in the record that a more thorough examination of plaintiff's medical records would have (or should have) led Dr. Hoffman to see plaintiff sooner, much less that a quick appointment would have allowed Dr. Hoffman to identify the infection and refer him to a neurosurgeon sooner. Dr.

11

Hoffman simply found that plaintiff's symptoms did not suggest that he was suffering from an infection, and plaintiff can point to nothing in the medical records at the time that would have alerted him to the infection. Finally, even if a jury were to assume that Dr. Hoffman was overworked and understaffed, it would provide basis to find his efforts at triage could amount to anything more than negligence.

Plaintiff also challenges Dr. Hoffman's actual treatment decisions through his expert Dr. Frank, whose report spoke in no uncertain terms about the proper course of treatment. Dr. Frank opined that Dr. Hoffman should have aspirated the bulge, ordered antibiotics (if appropriate), required the CT to be scheduled within a few days, and referred plaintiff to a neurosurgeon rather than a neurologist. Yet Dr. Frank also admitted in his deposition that: plaintiff had not presented with obvious symptoms of an infection, such as redness; a patient can have osteomyelitis for months without presenting with symptoms (such as a fever); and the symptoms of osteomyelitis are difficult to distinguish from other conditions. (Frank Dep. (dkt. #18) at 24, 26.)

Even assuming that Dr. Hoffman should have suspected an infection, Dr. Frank also acknowledges, given plaintiff's vulnerability to infections, aspirating the lump could have introduced an infection, creating room for doubt as to whether that was the *only* acceptable course of action. (*Id.* at 48.) Finally, while Dr. Frank opined that Dr. Hoffman should have required plaintiff to undergo the CT scan within a few days of the April 17 appointment, Dr. Frank made no comment about the subsequent treatment decisions made by UW neurology staff, most notably the UW NP, who also did not recommend plaintiff to undergo an immediate aspirating of the lump or a right-side craniotomy when

assessed, but instead deemed it appropriate to send him back to NLCI for a week of additional observation.

At most, Dr. Frank's opinion reflects the fact that "[t]here is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008) (affirming finding of no deliberate indifference where inmate received pain medicine and x-ray for back injury but not MRI or referral to surgeon). That is why, "[b]y itself an expert's assessment that a treatment decision was unreasonable is not enough to establish conscious disregard of a known risk." *Zaya v. Sood*, 836 F.3d 800, 806-07 (7th Cir. 2016) (citing *Duckworth v. Ahmad*, 532 F.3d 675, 681 (7th Cir. 2008)). While in *Zaya*, the court agreed that additional circumstance supported an inference of deliberate indifference, *see id.* at 806, plaintiff has directed the court to no other evidence of record suggesting that Dr. Hoffman acted with deliberate indifference.

In fact, the circumstances in this case are much closer to those the Seventh Circuit addressed in *Duckworth*, 532 F.3d 675. In that case, the court affirmed the district court's grant of summary judgment in favor of two doctors who handled a prisoner's medical care, mistaking the symptoms of cancer for a urinary tract infection. The plaintiff had submitted the expert testimony of an experienced urologist, who opined that "cancer should always be ruled out first before other conditions" when a patient presented with plaintiff's symptoms. *Id.* at 682. While the Seventh Circuit accepted that opinion as a "fair statement of how a reasonable doctor would treat Duckworth's symptoms," it did not shed light on the defendant doctor's state of mind. *Id.* Rather, the evidence showed that the

13

doctor's chosen course of treatment did not allow an inference of indifference (the doctor tried to cure what he thought was plaintiff's condition), and the doctor did not think the plaintiff actually had cancer. In the court's view, "it may have been prudent for [the doctor] to rule cancer out first. But this is just to reiterate the standard for medical malpractice, which falls short of deliberate indifference." *Id.* at 681.

Here, even though Dr. Hoffman's initial assessment ultimately proved to be mistaken, improperly believing the lump was likely to be a hydrocephalus rather than an infection or abscess, his approach to plaintiff's treatment does not allow a reasonable jury to infer deliberate indifference. While Dr. Hoffman knew that plaintiff's lump had been present for multiple weeks as of April 17, and that an infection was at least a possibility given plaintiff's susceptibility, *no* evidence of records suggests that Dr. Hoffman had reason to believe that plaintiff was actually suffering from an infection or abscess when he assessed him, much less that Hoffman chose to deliberately ignore that information. Rather, Dr. Hoffman testified in his deposition that it would not have been logical for him to infer immediately that he was suffering from osteomyelitis, given that he knew about plaintiff's seizure disorder. (Hoffman Dep. (dkt. #19) at 24.) Instead, Dr. Hoffman was concerned that the bulge was related to the old head trauma, specifically a breach in the skull and increased intracranial pressure. (*Id.* at 52.) Based on the information available *at the time* of his initial assessment, Dr. Hoffman was explicit in this belief: "It was not red. It was not warm. It didn't look like an infection." (*Id.* at 22, 52.) Likewise, his decision to refer him to a neurologist, not a neurosurgeon, and not to require that he be seen immediately,

reflected his impression that plaintiff's condition required a CT scan to rule out hydrocephalus.

As discussed above, any inference to the contrary is further undermined by plaintiff's subsequent assessment by the neurologist at UW Hospital. Indeed, while the referral to a neurosurgeon ordered plaintiff to be seen ASAP and he was held at UW for two days, even the neurosurgeon who saw him on April 29 did not deem it necessary to admit plaintiff for surgery or further assessment at that time. Rather, UW sent him back to NLCI to await his follow up, scheduled for May 12. While the neurologist wanted to act quickly to get a neurosurgeon's assessment of plaintiff's condition, the neurosurgeon did not see the need for quicker treatment. While Dr. Frank may have opined with the benefit of perfect hindsight, that Dr. Hoffman's decision exhibited an abandonment of professional judgment, Dr. Frank is wholly undermined by the contemporaneous treatment decisions made while plaintiff was at the UW Hospital's neurology department.

Finally, plaintiff argues that Dr. Hoffman did not act with adequate urgency, which unnecessarily prolonged his pain and thus supports an inference of deliberate indifference. *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). However, Dr. Hoffman explains that while he believed plaintiff's lump required urgent assessment, he did not believe that plaintiff's condition required *immediate* treatment because the condition he suspected -- hydrocephalus -- is slow progressing and not urgent. (Hoffman Dep. (dkt. #19) at 52.) While Dr. Hoffman's hunch as to plaintiff's diagnosis *may* have been negligent, his decision not to order the CT scan to take place the same day was grounded in his medical judgment.

Accordingly, Dr. Hoffman is entitled to summary judgment on the merits of plaintiff's claim.[2]

ORDER

IT IS ORDERED that:

(1) Defendant Dr. Hoffman's motion for summary judgment (dkt. #14) is GRANTED.

(2) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 26th day of August, 2019.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

---

[2] Since the court finds in Dr. Hoffman's favor on the merits, it need not resolve his qualified immunity defense.